CITY OF BURLINGTON *v.* DAGUE ET AL.

No. 91–810.   Argued April 21, 1992—Decided June 24, 1992

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, KENNEDY, SOUTER, and THOMAS, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 567. O'CONNOR, J., filed a dissenting opinion, *post*, p. 575.

*Michael B. Clapp* argued the cause and filed briefs for petitioner.

*Barry L. Goldstein* argued the cause for respondents. With him on the brief were *William W. Pearson, Guy T. Saperstein,* and *Mari Mayeda.*

*Richard H. Seamon* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General Starr, Acting Assistant Attorney General Hartman, Deputy Solicitor General Mahoney, Deputy Assistant Attorney General Clegg, Harriet S. Shapiro, Anne S. Almy,* and *Mark R. Haag.*[*]

---

[*]Briefs of *amici curiae* urging reversal were filed for the District of Columbia et al. by *John Payton,* Corporation Counsel for the District of Columbia, *Charles L. Reischel,* Deputy Corporation Counsel, and *Donna M. Murasky,* Assistant Corporation Counsel, and by the Attorneys General for their respective States as follows: *James H. Evans* of Alabama, *Daniel E. Lungren* of California, *Robert A. Butterworth* of Florida, *Roland W. Burris* of Illinois, *Linley E. Pearson* of Indiana, *Robert T. Stephan* of Kansas, *Scott Harshbarger* of Massachusetts, *Frankie Sue Del Papa* of Nevada, *Susan B. Loving* of Oklahoma, *Ernest D. Preate, Jr.,* of Pennsylvania, *Mark W. Barnett* of South Dakota, *Paul Van Dam* of Utah, and *James E. Doyle* of Wisconsin; and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp.*

Briefs of *amici curiae* urging affirmance were filed for the Alabama Employment Lawyers Association et al. by *Sanford Jay Rosen, Andrea G. Asaro, Steven R. Shapiro, John A. Powell, Leon Friedman, Julius L. Chambers, Charles Stephen Ralston,* and *Terisa E. Chaw;* for the American Bar Association by *Talbot S. D'Alemberte* and *Carter G. Phillips;* and for the Lawyer's Committee for Civil Rights Under Law et al. by *Roger E. Warin, Jerald S. Howe, Jr., D. Benson Tesdahl, Herbert M. Wachtell, William H. Brown III, Thomas J. Henderson,* and *Richard T. Seymour.*

JUSTICE SCALIA delivered the opinion of the Court.

This case presents the question whether a court, in determining an award of reasonable attorney's fees under § 7002(e) of the Solid Waste Disposal Act (SWDA), 90 Stat. 2826, as amended, 42 U. S. C. § 6972(e), or § 505(d) of the Federal Water Pollution Control Act (Clean Water Act (CWA)), 86 Stat. 889, as amended, 33 U. S. C. § 1365(d), may enhance the fee award above the "lodestar" amount in order to reflect the fact that the party's attorneys were retained on a contingent-fee basis and thus assumed the risk of receiving no payment at all for their services. Although different fee-shifting statutes are involved, the question is essentially identical to the one we addressed, but did not resolve, in *Pennsylvania* v. *Delaware Valley Citizens' Council for Clean Air*, 483 U. S. 711 (1987) *(Delaware Valley II)*.

I

Respondent Ernest Dague, Sr. (whom we will refer to in place of all the respondents), owns land in Vermont adjacent to a landfill that was owned and operated by petitioner city of Burlington. Represented by attorneys retained on a contingent-fee basis, he sued Burlington over its operation of the landfill. The District Court ruled, *inter alia*, that Burlington had violated provisions of the SWDA and the CWA, and ordered Burlington to close the landfill by January 1, 1990. It also determined that Dague was a "substantially prevailing party" entitled to an award of attorney's fees under the Acts, see 42 U. S. C. § 6972(e); 33 U. S. C. § 1365(d). 732 F. Supp. 458 (Vt. 1989).

In calculating the attorney's fees award, the District Court first found reasonable the figures advanced by Dague for his attorneys' hourly rates and for the number of hours expended by them, producing a resulting "lodestar" attorney's fee of $198,027.50. (What our cases have termed the "lodestar" is "the product of reasonable hours times a reasonable rate," *Pennsylvania* v. *Delaware Valley Citizens' Council*

*for Clean Air*, 478 U. S. 546, 565 (1986) *(Delaware Valley I).*) Addressing Dague's request for a contingency enhancement, the court looked to Circuit precedent, which provided that "'the rationale that should guide the court's discretion is whether "[w]ithout the possibility of a fee enhancement . . . competent counsel might refuse to represent [environmental] clients thereby denying them effective access to the courts."'" App. to Pet. for Cert. 131–132 (quoting *Friends of the Earth* v. *Eastman Kodak Co.*, 834 F. 2d 295, 298 (CA2 1987), in turn quoting *Lewis* v. *Coughlin*, 801 F. 2d 570, 576 (CA2 1986)). Following this guidance, the court declared that Dague's "risk of not prevailing was substantial" and that "absent an opportunity for enhancement, [Dague] would have faced substantial difficulty in obtaining counsel of reasonable skill and competence in this complicated field of law." It concluded that "a 25% enhancement is appropriate, but anything more would be a windfall to the attorneys." It therefore enhanced the lodestar amount by 25%—$49,506.87. App. to Pet. for Cert. 133, 134.

The Court of Appeals affirmed in all respects. Reviewing the various opinions in *Delaware Valley II*, the court concluded that the issue whether and when a contingency enhancement is warranted remained open, and expressly disagreed with the position taken by some Courts of Appeals that the concurrence in *Delaware Valley II* was controlling. The court stated that the District Court had correctly relied on Circuit precedent, and, holding that the District Court's findings were not clearly erroneous, it upheld the 25% contingency enhancement. 935 F. 2d 1343, 1359–1360 (CA2 1991). We granted certiorari only with respect to the propriety of the contingency enhancement. 502 U. S. 1071 (1992).

## II

We first provide some background to the issue before us. Fees for legal services in litigation may be either "certain" or "contingent" (or some hybrid of the two). A fee is certain

if it is payable without regard to the outcome of the suit; it is contingent if the obligation to pay depends on a particular result's being obtained. Under the most common contingent-fee contract for litigation, the attorney receives no payment for his services if his client loses. Under this arrangement, the attorney bears a contingent risk of nonpayment that is the inverse of the case's prospects of success: if his client has an 80% chance of winning, the attorney's contingent risk is 20%.

In *Delaware Valley II*, we reversed a judgment that had affirmed enhancement of a fee award to reflect the contingent risk of nonpayment. In the process, we addressed whether the typical federal fee-shifting statute (there, §304(d) of the Clean Air Act, 42 U. S. C. §7604(d)) permits an attorney's fees award to be enhanced on account of contingency. In the principal opinion, JUSTICE WHITE, joined on this point by three other Justices, determined that such enhancement is not permitted. 483 U. S., at 723–727. JUSTICE O'CONNOR, in an opinion concurring in part and concurring in the judgment, concluded that no enhancement for contingency is appropriate "unless the applicant can establish that without an adjustment for risk the prevailing party would have faced substantial difficulties in finding counsel in the local or other relevant market," *id.*, at 733 (internal quotation marks omitted), and that any enhancement "must be based on the difference in market treatment of contingent fee cases *as a class*, rather than on an assessment of the 'riskiness' of any particular case," *id.*, at 731 (emphasis in original). JUSTICE BLACKMUN's dissenting opinion, joined by three other Justices, concluded that enhancement for contingency is always statutorily required. *Id.*, at 737–742, 754.

We turn again to this same issue.

## III

Section 7002(e) of the SWDA and §505(d) of the CWA authorize a court to "award costs of litigation (including *rea-*

*sonable attorney . . . fees)*" to a "prevailing or substantially prevailing party." 42 U. S. C. § 6972(e) (emphasis added); 33 U. S. C. § 1365(d) (emphasis added). This language is similar to that of many other federal fee-shifting statutes, see, *e. g.*, 42 U. S. C. §§ 1988, 2000e–5(k), 7604(d); our case law construing what is a "reasonable" fee applies uniformly to all of them. *Flight Attendants* v. *Zipes*, 491 U. S. 754, 758, n. 2 (1989).

The "lodestar" figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence. We have established a "strong presumption" that the lodestar represents the "reasonable" fee, *Delaware Valley I, supra*, at 565, and have placed upon the fee applicant who seeks more than that the burden of showing that "such an adjustment is *necessary* to the determination of a reasonable fee." *Blum* v. *Stenson*, 465 U. S. 886, 898 (1984) (emphasis added). The Court of Appeals held, and Dague argues here, that a "reasonable" fee for attorneys who have been retained on a contingency-fee basis must go beyond the lodestar, to compensate for risk of loss and of consequent nonpayment. Fee-shifting statutes should be construed, he contends, to replicate the economic incentives that operate in the private legal market, where attorneys working on a contingency-fee basis can be expected to charge some premium over their ordinary hourly rates. Petitioner Burlington argues, by contrast, that the lodestar fee may not be enhanced for contingency.

We note at the outset that an enhancement for contingency would likely duplicate in substantial part factors already subsumed in the lodestar. The risk of loss in a particular case (and, therefore, the attorney's contingent risk) is the product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits. The second factor, however, is ordinarily reflected in the lodestar—either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so. *Blum,*

*supra,* at 898–899. Taking account of it again through lodestar enhancement amounts to double counting. *Delaware Valley II,* 483 U. S., at 726–727 (plurality opinion).

The first factor (relative merits of the claim) is not reflected in the lodestar, but there are good reasons why it should play no part in the calculation of the award. It is, of course, a factor that *always* exists (no claim has a 100% chance of success), so that computation of the lodestar would never end the court's inquiry in contingent-fee cases. See *id.,* at 740 (BLACKMUN, J., dissenting). Moreover, the consequence of awarding contingency enhancement to take account of this "merits" factor would be to provide attorneys with the same incentive to bring relatively meritless claims as relatively meritorious ones. Assume, for example, two claims, one with underlying merit of 20%, the other of 80%. Absent any contingency enhancement, a contingent-fee attorney would prefer to take the latter, since he is four times more likely to be paid. But with a contingency enhancement, this preference will disappear: the enhancement for the 20% claim would be a multiplier of 5 (100/20), which is quadruple the 1.25 multiplier (100/80) that would attach to the 80% claim. Thus, enhancement for the contingency risk posed by each case would encourage meritorious claims to be brought, but only at the social cost of indiscriminately encouraging nonmeritorious claims to be brought as well. We think that an unlikely objective of the "reasonable fees" provisions. "These statutes were not designed as a form of economic relief to improve the financial lot of lawyers." *Delaware Valley I,* 478 U. S., at 565.

Instead of enhancement based upon the contingency risk posed by each case, Dague urges that we adopt the approach set forth in the *Delaware Valley II* concurrence. We decline to do so, first and foremost because we do not see how it can intelligibly be applied. On the one hand, it would require the party seeking contingency enhancement to "establish that without the adjustment for risk [he] 'would have faced

substantial difficulties in finding counsel in the local or other relevant market.'" 483 U. S., at 733. On the other hand, it would forbid enhancement based "on an assessment of the 'riskiness' of any particular case." *Id.*, at 731; see *id.*, at 734 (no enhancement "based on 'legal' risks or risks peculiar to the case"). But since the predominant reason that a contingent-fee claimant has difficulty finding counsel in any legal market where the winner's attorney's fees will be paid by the loser is that attorneys view his case as too risky (*i. e.*, too unlikely to succeed), these two propositions, as a practical matter, collide. See *King* v. *Palmer*, 292 U. S. App. D. C. 362, 371, 950 F. 2d 771, 780 (1991) (en banc), cert. pending *sub nom. King* v. *Ridley*, No. 91–1370.

A second difficulty with the approach taken by the concurrence in *Delaware Valley II* is that it would base the contingency enhancement on "the difference in market treatment of contingent fee cases *as a class.*" 483 U. S., at 731 (emphasis in original). To begin with, for a very large proportion of contingency-fee cases—those seeking not monetary damages but injunctive or other equitable relief—there is no "market treatment." Such cases scarcely exist, except to the extent Congress has created an artificial "market" for them by fee shifting—and looking to *that* "market" for the meaning of fee shifting is obviously circular. Our decrees would follow the "market," which in turn is based on our decrees. See *King* v. *Palmer*, 285 U. S. App. D. C. 68, 76, 906 F. 2d 762, 770 (1990) (Williams, J., concurring) ("I see the judicial judgment as defining the market, not vice versa"), vacated, 292 U. S. App. D. C. 362, 950 F. 2d 771 (1991), cert. pending *sub nom. King* v. *Ridley*, No. 91–1370. But even apart from that difficulty, any approach that applies uniform treatment to the entire class of contingent-fee cases, or to any conceivable subject-matter-based subclass, cannot possibly achieve the supposed goal of mirroring market incentives. As discussed above, the contingent risk of a case (and hence the difficulty of getting contingent-fee lawyers to take

it) depends principally upon its particular merits. Contingency enhancement calculated on *any* class-wide basis, therefore, guarantees *at best* (leaving aside the double-counting problem described earlier) that those cases within the class that have the class-average chance of success will be compensated according to what the "market" requires to produce the services, and that *all cases* having above-class-average chance of success will be overcompensated.

Looking beyond the *Delaware Valley II* concurrence's approach, we perceive no other basis, fairly derivable from the fee-shifting statutes, by which contingency enhancement, if adopted, could be restricted to fewer than all contingent-fee cases. And we see a number of reasons for concluding that no contingency enhancement whatever is compatible with the fee-shifting statutes at issue. First, just as the statutory language limiting fees to prevailing (or substantially prevailing) parties bars a prevailing plaintiff from recovering fees relating to claims on which he lost, *Hensley* v. *Eckerhart*, 461 U. S. 424 (1983), so should it bar a prevailing plaintiff from recovering for the risk of loss. See *Delaware Valley II, supra,* at 719–720, 724–725 (principal opinion). An attorney operating on a contingency-fee basis pools the risks presented by his various cases: cases that turn out to be successful pay for the time he gambled on those that did not. To award a contingency enhancement under a fee-shifting statute would in effect pay for the attorney's time (or anticipated time) in cases where his client does *not* prevail.

Second, both before and since *Delaware Valley II*, "we have generally turned away from the contingent-fee model"—which would make the fee award a percentage of the value of the relief awarded in the primary action*—"to

---

*Contrary to JUSTICE BLACKMUN's understanding, *post*, at 572, there is no reason in theory why the contingent-fee model could not apply to relief other than damages; where injunctive relief is obtained, for example, the fee award would simply be a percentage of the value of the injunctive relief. There would be, to be sure, severe problems of administration in

the lodestar model." *Venegas* v. *Mitchell*, 495 U. S. 82, 87 (1990). We have done so, it must be noted, even though the lodestar model often (perhaps, generally) results in a larger fee award than the contingent-fee model. See, *e. g.*, Report of the Federal Courts Study Committee 104 (Apr. 2, 1990) (lodestar method may "give lawyers incentives to run up hours unnecessarily, which can lead to overcompensation"). For example, in *Blanchard* v. *Bergeron*, 489 U. S. 87 (1989), we held that the lodestar governed, even though it produced a fee that substantially exceeded the amount provided in the contingent-fee agreement between plaintiff and his counsel (which was self-evidently an amount adequate to attract the needed legal services). *Id.*, at 96. Contingency enhancement is a feature inherent in the contingent-fee model (since attorneys factor in the particular risks of a case in negotiating their fee and in deciding whether to accept the case). To engraft this feature onto the lodestar model would be to concoct a hybrid scheme that resorts to the contingent-fee model to increase a fee award but not to reduce it. Contingency enhancement is therefore not consistent with our general rejection of the contingent-fee model for fee awards, nor is it necessary to the determination of a reasonable fee.

And finally, the interest in ready administrability that has underlain our adoption of the lodestar approach, see, *e. g.*, *Hensley*, 461 U. S., at 433, and the related interest in avoiding burdensome satellite litigation (the fee application "should not result in a second major litigation," *id.*, at 437), counsel strongly against adoption of contingency enhancement. Contingency enhancement would make the setting of fees more complex and arbitrary, hence more unpredictable, and hence more litigable. It is neither necessary nor even possible for application of the fee-shifting statutes to mimic the intrica-

---

determining the value of injunctive relief, but such problems simply highlight why we have rejected the contingent-fee model in favor of the lodestar model.

cies of the fee-paying market in every respect. See *Delaware Valley I*, 478 U. S., at 565.

\* \* \*

Adopting the position set forth in JUSTICE WHITE's opinion in *Delaware Valley II*, 483 U. S., at 715–727, we hold that enhancement for contingency is not permitted under the fee-shifting statutes at issue. We reverse the Court of Appeals' judgment insofar as it affirmed the 25% enhancement of the lodestar.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE STEVENS joins, dissenting.

In language typical of most federal fee-shifting provisions, the statutes involved in this case authorize courts to award the prevailing party a "reasonable" attorney's fee.[1] Two principles, in my view, require the conclusion that the "enhanced" fee awarded to respondents was reasonable. First, this Court consistently has recognized that a "reasonable" fee is to be a "fully compensatory fee," *Hensley* v. *Eckerhart*, 461 U. S. 424, 435 (1983), and is to be "calculated on the basis of rates and practices prevailing in the relevant market." *Missouri* v. *Jenkins*, 491 U. S. 274, 286 (1989). Second, it is a fact of the market that an attorney who is paid only when his client prevails will tend to charge a higher fee than one who is paid regardless of outcome,[2] and relevant professional standards long have recognized that this practice is reasonable.[3]

---

[1] See 33 U. S. C. § 1365(d) (Clean Water Act); 42 U. S. C. § 6972(e) (Solid Waste Disposal Act).

[2] See, *e. g.*, R. Posner, Economic Analysis of Law § 21.9, pp. 534–535 (3d ed. 1986).

[3] See Canons of Ethics § 12, 33 A. B. A. Rep. 575, 578 (1908); Model Code of Professional Responsibility, DR 2–106(B)(8) (1980); ABA Model Rules of Professional Conduct, Rule 1.5(a)(8) (1992).

The Court does not deny these principles. It simply refuses to draw the conclusion that follows ineluctably: If a statutory fee consistent with market practices is "reasonable," and if in the private market an attorney who assumes the risk of nonpayment can expect additional compensation, then it follows that a statutory fee may include additional compensation for contingency and still qualify as reasonable. The Court's decision to the contrary violates the principles we have applied consistently in prior cases and will seriously weaken the enforcement of those statutes for which Congress has authorized fee awards—notably, many of our Nation's civil rights laws and environmental laws.

## I

Congress' purpose in adopting fee-shifting provisions was to strengthen the enforcement of selected federal laws by ensuring that private persons seeking to enforce those laws could retain competent counsel. See S. Rep. No. 94–1011, p. 6 (1976). In particular, federal fee-shifting provisions have been designed to address two related difficulties that otherwise would prevent private persons from obtaining counsel. First, many potential plaintiffs lack sufficient resources to hire attorneys. See H. R. Rep. No. 94–1558, p. 1 (1976); S. Rep. No. 94–1011, at 2. Second, many of the statutes to which Congress attached fee-shifting provisions typically will generate either no damages or only small recoveries; accordingly, plaintiffs bringing cases under these statutes cannot offer attorneys a share of a recovery sufficient to justify a standard contingent-fee arrangement. See *Pennsylvania* v. *Delaware Valley Citizens' Council for Clean Air (Delaware Valley II)*, 483 U. S. 711, 749 (1987) (dissenting opinion); H. R. Rep. No. 94–1558, at 9. The strategy of the fee-shifting provisions is to attract competent counsel to selected federal cases by ensuring that if they prevail, counsel will receive fees commensurable with what they could obtain in other litigation. If federal fee-bearing

litigation is less remunerative than private litigation, then the only attorneys who will take such cases will be underemployed lawyers—who likely will be less competent than the successful, busy lawyers who would shun federal fee-bearing litigation—and public interest lawyers who, by any measure, are insufficiently numerous to handle all the cases for which other competent attorneys cannot be found. See *Delaware Valley II*, 483 U. S., at 742–743 (dissenting opinion).

In many cases brought under federal statutes that authorize fee shifting, plaintiffs will be unable to ensure that their attorneys will be compensated for the risk that they might not prevail. This will be true in precisely those situations targeted by the fee-shifting statutes—where plaintiffs lack sufficient funds to hire an attorney on a win-or-lose basis and where potential damages awards are insufficient to justify a standard contingent-fee arrangement. In these situations, unless the fee-shifting statutes are construed to compensate attorneys for the risk of nonpayment associated with loss, the expected return from cases brought under federal fee-shifting provisions will be less than could be obtained in otherwise comparable private litigation offering guaranteed, win-or-lose compensation. Prudent counsel, under these conditions, would tend to avoid federal fee-bearing claims in favor of private litigation, even in the very situations for which the attorney's fee statutes were designed. This will be true even if the fee-bearing claim is more likely meritorious than the competing private claim.

In *Delaware Valley II*, five Justices of this Court concluded that for these reasons the broad statutory term "reasonable attorney's fee" must be construed to permit, in some circumstances, compensation above the hourly win-or-lose rate generally borrowed to compute the lodestar fee. See 483 U. S., at 731, 732–733 (O'CONNOR, J., concurring in part and concurring in judgment); *id.*, at 735 (dissenting opinion). Together with the three Justices who joined my dissenting opinion in that case, I would have allowed enhancement

where, and to the extent that, the attorney's compensation is contingent upon prevailing and receiving a statutory award. I indicated that if, by contrast, the attorney and client have been able to mitigate the risk of nonpayment—either in full, by agreeing to win-or-lose compensation or to a contingent share of a substantial damages recovery, or in part, by arranging for partial payment—then to that extent enhancement should be unavailable. *Id.*, at 748–749. I made clear that the "risk" for which enhancement might be available is not the particular factual and legal riskiness of an individual case, but the risk of nonpayment associated with contingent cases considered as a class. *Id.*, at 745–747, 752. Congress, I concluded, did not intend to prohibit district courts from considering contingency in calculating a "reasonable" attorney's fee.[4]

JUSTICE O'CONNOR's concurring opinion agreed that "Congress did not intend to foreclose consideration of contingency in setting a reasonable fee," *id.*, at 731, and that "compensation for contingency must be based on the difference in market treatment of contingent-fee cases *as a class*, rather than on an assessment of the 'riskiness' of any particular case" (emphasis in original). *Ibid.* As I understand her opinion,

---

[4] A number of bills introduced in Congress would have done just this, by prohibiting "bonuses and multipliers" where a suit is against the United States, a State, or a local government. These bills failed to receive congressional approval. See *Delaware Valley II*, 483 U. S., at 739, n. 3 (dissenting opinion).

Moreover, in some instances Congress explicitly has prohibited enhancements, as in the 1986 amendments to the Education of the Handicapped Act. See 20 U. S. C. § 1415(e)(4)(C) ("[n]o bonus or multiplier may be used in calculating the fees awarded under this subsection"). Congress' express prohibition on enhancement in this statute suggests that it did not understand the standard fee-shifting language used elsewhere to bar enhancement. Cf. *West Virginia Univ. Hospitals, Inc.* v. *Casey*, 499 U. S. 83, 92–97 (1991) (relying, in part, on express authorization of expert-witness fees in subsequently passed fee-shifting statutes to infer that such fees could not have been included in unsupplemented references to "attorney's fees").

JUSTICE O'CONNOR further agreed that a court considering an enhancement must determine whether and to what extent the attorney's compensation was contingent, as well as whether and to what extent that contingency was, or could have been, mitigated. Her concurrence added, however, an additional inquiry designed to make the market-based approach "not merely justifiable in theory but also objective and nonarbitrary in practice." *Id.*, at 732. She suggested two additional "constraints on a court's discretion" in determining whether, and how much, enhancement is warranted. First, "district courts and courts of appeals should treat a determination of how a particular market compensates for contingency as controlling future cases involving the same market," and varying rates of enhancement among markets must be justifiable by reference to real differences in those markets. *Id.*, at 733. Second, the applicant bears the burden of demonstrating that without an adjustment for risk "the prevailing party would have faced substantial difficulties in finding counsel in the local or other relevant market." *Ibid.* (internal quotation marks omitted).

## II

After criticizing at some length an approach it admits respondents and their *amici* do not advocate, see *ante*, at 563–564, and after rejecting the approach of the *Delaware Valley II* concurrence, see *ante*, at 564–565, the Court states that it "see[s] a number of reasons for concluding that no contingency enhancement whatever is compatible with the fee-shifting statutes at issue." *Ante*, at 565. I do not find any of these arguments persuasive.

The Court argues, first, that "[a]n attorney operating on a contingency-fee basis pools the risks presented by his various cases" and uses the cases that were successful to subsidize those that were not. *Ibid.* "To award a contingency enhancement under a fee-shifting statute," the Court concludes, would "in effect" contravene the prevailing-party

limitation, by allowing the attorney to recover fees for cases in which his client does not prevail. *Ibid.* What the words "in effect" conceal, however, is the Court's inattention to the language of the statutes: The provisions at issue in this case, like fee-shifting provisions generally, authorize fee awards to prevailing *parties*, not their attorneys. See 33 U. S. C. § 1365(d); 42 U. S. C. § 6972(e); see also *Venegas* v. *Mitchell*, 495 U. S. 82, 87 (1990). Respondents simply do not advocate awarding fees to any party who has not prevailed. Moreover, the Court's reliance on the "prevailing party" limitation is somewhat misleading: the Court's real objection to contingency enhancement is that the *amount* of an enhanced award would be excessive, not that parties receiving enhanced fee awards are not prevailing parties *entitled* to an award. In prior cases the Court has been careful to distinguish between these two issues. See, *e. g., Hensley* v. *Eckerhart*, 461 U. S., at 433 (The "prevailing party" determination only "brings the plaintiff . . . across the statutory threshold. It remains for the district court to determine what fee is 'reasonable'").

Second, the Court suggests that "both before and since *Delaware Valley II*, 'we have generally turned away from the contingent-fee model'—which would make the fee award a percentage of the value of the relief awarded in the primary action—'to the lodestar model.'" *Ante*, at 565–566 (footnote omitted), quoting *Venegas* v. *Mitchell*, 495 U. S., at 87. This argument simply plays on two meanings of "contingency." Most assuredly, respondents—who received no damages for their fee-bearing claims—do not advocate "mak[ing] the fee award a percentage" of that amount. Rather, they argue that the *lodestar* figure must be enhanced because their attorneys' compensation was contingent on prevailing, and because their attorneys could not otherwise be compensated for assuming the risk of nonpayment.

Third, the Court suggests that allowing for contingency enhancement "would make the setting of fees more complex

and arbitrary" and would likely lead to "burdensome satellite litigation" that this Court has said should be avoided. *Ante*, at 566. The present case is an odd one in which to make this point: The issue of enhancement hardly occupied center stage in the fees portion of this litigation, and it became a time-consuming matter only after the Court granted certiorari, limited to this question alone.[5] Moreover, if JUSTICE O'CONNOR's standard were adopted, the matter of the amount by which fees should be increased would quickly become settled in the various district courts and courts of appeals for the different kinds of federal litigation. And in any event, speculation that enhancement determinations would be "burdensome" does not speak to the issue whether they are required by the fee-shifting statutes.

The final objection to be considered is the Court's contention that any approach that treats contingent-fee cases as a class is doomed to failure. The Court's argument on this score has two parts. First, the Court opines that "for a very large proportion of contingency-fee cases"—cases in which only equitable relief is sought—"there is no 'market treatment,'" except insofar as Congress has created an "artificial" market with the fee-shifting statutes themselves. It is circular, the Court contends, to "loo[k] to *that* 'market' for the meaning of fee-shifting." *Ante*, at 564. And even leaving that difficulty aside, the Court continues, the real "risk" to which lawyers respond is the riskiness of particular cases. Because under a class-based contingency enhancement system the same enhancement will be awarded whether the

---

[5] It is fair to say that petitioner's attention was directed almost exclusively toward the merits issues, both in the lower courts and in its petition for certiorari. While petitioner sharply contested respondents' entitlement to an award and objected to the amount of the lodestar, its opposition to enhancement occupies only a single page of its memorandum in opposition to the motion for fees and costs. See App. 224–225. Only a little more than 1 page of the 30-page petition for certiorari is devoted to the issue of contingency enhancement. See Pet. for Cert. 25–27.

chance of prevailing was 80% or 20%, "*all cases* having above-class-average chance of success will be overcompensated" (emphasis in original). *Ante,* at 565.

Both parts of this argument are mistaken. The circularity objection overlooks the fact that even under the Court's unenhanced lodestar approach, the district court must find a relevant private market from which to select a fee. The Court offers no reason why this market disappears only when the inquiry turns to enhancement. The second part of the Court's argument is mistaken so far as it assumes the only relevant incentive to which attorneys respond is the risk of losing particular cases. As explained above, a proper system of contingency enhancement addresses a different kind of incentive: the common incentive of all lawyers to avoid *any* fee-bearing claim in which the plaintiff cannot guarantee the lawyer's compensation if he does not prevail. Because, as the Court observes, "no claim has a 100% chance of success," *ante,* at 563, *any* such case under a pure lodestar system will offer a lower prospective return per hour than one in which the lawyer will be paid at the same lodestar rate, win or lose. Even the *least* meritorious case in which the attorney is guaranteed compensation whether he wins or loses will be economically preferable to the *most* meritorious fee-bearing claim in which the attorney will be paid only if he prevails, so long as the cases require the same amount of time. Yet as noted above, this latter kind of case—in which potential plaintiffs can neither afford to hire attorneys on a straight hourly basis nor offer a percentage of a substantial damages recovery—is exactly the kind of case for which the fee-shifting statutes were designed.

## III

Preventing attorneys who bring actions under fee-shifting statutes from receiving fully compensatory fees will harm far more than the legal profession. Congress intended the fee-shifting statutes to serve as an integral enforcement

mechanism in a variety of federal statutes—most notably, civil rights and environmental statutes. The *amicus* briefs filed in this case make clear that we can expect many meritorious actions will not be filed, or, if filed, will be prosecuted by less experienced and able counsel.[6] Today's decision weakens the protections we afford important federal rights.

I dissent.

JUSTICE O'CONNOR, dissenting.

I continue to be of the view that in certain circumstances a "reasonable" attorney's fee should not be computed by the purely retrospective lodestar figure, but also must incorporate a reasonable incentive to an attorney contemplating whether or not to take a case in the first place. See *Pennsylvania* v. *Delaware Valley Citizens' Council for Clean Air*, 483 U. S. 711, 731–734 (1987) *(Delaware Valley II)* (O'CONNOR, J., concurring in part and concurring in judgment). As JUSTICE BLACKMUN cogently explains, when an attorney must choose between two cases—one with a client who will pay the attorney's fees win or lose and the other who can only promise the statutory compensation if the case is successful—the attorney will choose the fee-paying client, unless the contingency client can promise an enhancement of sufficient magnitude to justify the extra risk of nonpayment. *Ante,* at 568–569. Thus, a reasonable fee should be one that would "attract competent counsel," *Delaware Valley II, supra,* at 733 (O'CONNOR, J., concurring in part and concurring in judgment), and in some markets this must include the assurance of a contingency enhancement if the plaintiff should prevail. I therefore dissent from the Court's holding that a "reasonable" attorney's fee can never include an enhancement for cases taken on contingency.

---

[6] See Brief for Lawyers' Committee for Civil Rights Under Law et al. as *Amici Curiae* 16–22; Brief for Alabama Employment Lawyers Association et al. as *Amici Curiae* 12–13.

In my view the promised enhancement should be "based on the difference in market treatment of contingent fee cases as a class, rather than on an assessment of the 'riskiness' of any particular case." 483 U. S., at 731 (emphasis omitted). As JUSTICE BLACKMUN has shown, the Court's reasons for rejecting a market-based approach do not stand up to scrutiny. *Ante*, at 574. Admittedly, the courts called upon to determine the enhancements appropriate for various markets would be required to make economic calculations based on less-than-perfect data. Yet that is also the case, for example, in inverse condemnation and antitrust cases, and the Court has never suggested that the difficulty of the task or possible inexactitude of the result justifies forgoing those calculations altogether. As JUSTICE BLACKMUN notes, these initial hurdles would be overcome as the enhancements appropriate to various markets became settled in the district courts and courts of appeals. *Ante*, at 573.

In this case, the District Court determined that a 25% contingency enhancement was appropriate by reliance on the likelihood of success in the individual case. App. to Pet. for Cert. 132–133. The Court of Appeals affirmed on the basis of its holding in *Friends of the Earth* v. *Eastman Kodak Co.*, 834 F. 2d 295 (CA2 1987), which asks simply whether, without the possibility of a fee enhancement, the prevailing party would not have been able to obtain competent counsel. 935 F. 2d 1343, 1360 (CA2 1991) (citing *Friends of the Earth, supra*). Although I believe that inquiry is part of the contingency enhancement determination, see *Delaware Valley II, supra*, at 733 (O'CONNOR, J., concurring in part and concurring in judgment), I also believe that it was error to base the degree of enhancement on case-specific factors. Because I can find no market-specific support for the 25% enhancement figure in the affidavits submitted by respondents in support of the fee request, I would vacate the judgment affirming the fee award and remand for a market-based assessment of a suitable enhancement for contingency.